**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **No. 07 CR 855** |
| | ) | |
| **SAMUEL SHABAZ,** | ) | **Judge Suzanne Conlon** |
| | ) | |
| **Defendant.** | ) | |

**OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION THAT**
**SAMUEL SHABAZ'S MOTION TO SUPPRESS BE DENIED**

Samuel Shabaz, by his attorney Ellen R. Domph objects to Magistrate Judge Schenkier's

Report and Recommendation denying his Motion to Suppress Statements. In support, it is stated:

**I.      Background**

On February 11, 2008 Mr. Shabaz filed a motion to suppress statements alleging that his

constitutional rights were violated when he requested an attorney and one was not provided

after his arrest; when interrogation did not cease once he invoked his rights under *Miranda v.*

*Arizona;* and when false promises of leniency were made to him for purposes of coercing an

involuntary statement.

Judge Conlon referred the matter to Magistrate Judge Sidney Schenkier ("the

Magistrate") for an evidentiary hearing. A hearing was held over several days and on April

11, 2008, the Magistrate reported his findings and recommendations on the record, without a

written opinion.  (The transcript of that opinion is attached hereto as Exhibits 1, 2, & 3).[1]

**II.      Facts Adduced at Hearing**

On December 21, 2007, at about 8:00 a.m., Mr. Shabaz was arrested at his home at 12703

---

[1] The transcript was divided in to three parts so that it could be electronically filed.

South Carondolet, Chicago, Illinois. (37-38, 229). He awoke to noise-shouting and opened his bedroom door to find several police and FBI inside his home. (Tr 269). His front door had been kicked in by law enforcement. (Tr 41). Dressed in sweat pants and shirt, Mr. Shabaz faced law enforcement at gun point. They placed him face down on his bed and handcuffed him behind his back. (Tr 233). He was transported to the Calumet City police station by FBI agent Wentz and Oak Lawn police detective Hunt. (Tr 235, 237, 270).

On the trip to Calumet City, Mr. Shabaz asked the reason for his detention, but was essentially ignored. No further conversation occurred. (Tr 236). Mr. Shabaz remained handcuffed while the officers escorted him inside the police station. He was allowed to use the bathroom, but was immediately re-cuffed afterward. (Tr 240-241). Mr. Shabaz requested an attorney. (Tr 241, 276). FBI Agent Watson, replied, "let's just get you down there," meaning, to the interrogation room. (Tr 241, 276-77). Mr. Shabaz was placed in a 10 x 15 interrogation room with FBI agents Wentz, Watson, and Oak Lawn detectives Hunt, Keenan and McGuire.[2] (Tr 242). No court reporter, audio or video recording devices were present. (Tr 61-62,122-23).

On a table in front of him, Watson had papers and what appeared to be Mr. Shabaz's driver's license. (Tr 242). At about 8:30 or 8:35 am, without reading him his rights, Watson told Mr. Shabaz that "We know what you've been doing. We know about your record. Why don't you start from the beginning." (Tr 53, 114, 243, 245). Shabaz again requested an attorney, stating, "I'd like an attorney." (Tr 243). Questioning did not cease, and instead Watson continued the interrogation, asking "Why don't you tell us what you've been doing. We have evidence. We have pictures." (Tr 244). Mr. Shabaz again asked for a lawyer,

---

[2] McGuire was not called to testify by the government although she was a material witness to the taking of the alleged statement.

2

received no response, and the interrogation continued with, "Why don't you tell us what happened? We have DNA evidence, and we have pictures." Again Mr. Shabaz asked for an attorney. (Tr 245). The questioning persisted, directed at specific dates in April. (Tr 245).

Mr. Shabaz asked again for an attorney. He also asked to make phone calls-one to his girlfriend to inform her of his situation and tell her to contact a lawyer, and one to a friend, Khabir to inform him he would be unable to pick him up from the airport . (Tr 290). He knew his girlfriend Maritza's phone number, but not Khabir's, by memory. (Tr 271). The agents who were in his house could get Khabir's telephone number from his cell phone. (Tr 291).Watson refused his request for a phone call, stating he could have one when "we're done talking here." Mr. Shabaz understood that to mean that he would not receive a phone call until he spoke with the officers. (Tr 247-48).

Agent Watson told Shabaz that he was wanted on some bank robberies and that things would go easier on him if he spoke with police now. Mr. Shabaz understood that to mean if he cooperated he would not be punished as hard. (Tr 249). Mr. Shabaz continued to request an attorney and Keenan responded that "things would go easier on me if I cooperate, that the prosecution and judges look at cooperation favorably…" Mr. Shabaz understood that to mean that if he spoke to law enforcement he would be rewarded. (Tr 249, 280). This back and forth discussion persisted for about 10 minutes with no advice of rights, after which Watson presented Shabaz with a pre-printed advice of rights form. (Tr 250-51; Govt Ex 1 attached hereto as Ex A). Mr. Shabaz read it silently, understood it, and pushed it back toward the agent, telling him he was not going to sign the form. Watson wrote  "refused to sign" in the signature line. (Tr 55-56, 115). Mr. Shabaz's initials were not on the advice of rights form, although  it was typical FBI practice to have a suspect initial by each stated right. (Tr 54).

He never waived his rights and refused to sign the *Miranda* waiver because he wanted an attorney. (Tr 252, 288). Keenan told him his cooperation was going to go a long way. Watson informed him that this was a critical moment and that he had to make a decision about cooperating and that "things are going to go better for you if you cooperate now with us." Watson told him that he was looking at a lot of time. (Tr 252-53). No agent or officer inquired about his refusal to sign the form. (Tr 254). Wentz assured Mr. Shabaz that things would go better for him if he talked. (Tr 255). At this point Mr. Shabaz, still wanted a lawyer, but quit asking for one, believing they were never going to give him one. (Tr 255).

Mr. Shabaz had previously been convicted of armed robbery in 1997 and 2001. (Tr 285-86). In 1997 he had waived his *Miranda* rights by signing a written waiver because he did not want an attorney. Now he wanted one.

After about 20 minutes, Mr. Shabaz began speaking to law enforcement about the alleged robberies because of their promises that things would go easier if he spoke to them. He was frustrated and felt pushed into a corner. (Tr 256-57).

About 10 minutes into Mr. Shabaz making a statement, after he refused to sign the *Miranda* waiver, he was shown a pre-printed consent to search form, absent any handwriting indicating the particulars of the places or objects to be searched. (Tr  257-60; Govt Ex 2 attached hereto as Ex B). Mr. Shabaz signed the pre-printed form because he believed things would go harder on him if he did not, and easier if he signed. (Tr 262). The specifics were not filled in before he signed the consent form.

The questioning latest about 40 minutes and afterwards he was transported by Wentz, Keenan and Hunt to FBI headquarters in Chicago. On route, Mr. Shabaz was allowed to call his girlfriend. Keenan gave him a telephone, dialing his girlfriend's number that he had

previously given to Wentz. (Tr 267, 271). He told her to get him an attorney. (Tr 285).

Two FBI agents and two Oak Lawn detectives testified at the hearing. They all said Mr. Shabaz never requested a lawyer in the interrogation room, nor did any of them promise leniency. Watson testified that he did hear Mr. Shabaz used the word attorney sometime between Mr. Shabaz's arrival at Calumet City police station before he was Mirandized. (Tr 79). Watson could not remember, however, any specifics-not what was happening at the time the word was mentioned; not where Mr. Shabaz was exactly; whom exactly Mr. Shabaz was addressing; nor the context of Mr. Shabaz's use of the word attorney. (Tr 79-80, 123-25). Watson never followed up on Mr. Shabaz's comment. (Tr 124). Officer Hunt, who claimed he was always within earshot of Watson and Mr. Shabaz contradicted Watson, saying he never heard mention of the words attorney or lawyer. (Tr 195-96).

The witnesses for the government gave various accounts describing the events of December 21, 2008. All but Watson said the arrest was at 8:00 a.m. Watson testified that the arrest transpired at 7:00 a.m. (Tr 98).  Wentz believed Mr. Shabaz was handcuffed from arrest throughout interrogation and beyond. (Tr 47-49). Watson did not recall if Mr. Shabaz was handcuffed in the interrogation room, but thought not. He did not know FBI procedures concerning handcuffing suspects in secure areas. (Tr 103-05).

The government witnesses all agreed Mr. Shabaz was not permitted to make phone calls prior to interrogation, but Wentz and Watson characterized it as a precaution until law enforcement could acquire more information about the bomb-making materials they had seen in plain view while arresting Mr. Shabaz.

The government witnesses were conflicted concerning when and how they acquired telephone numbers for the Mr. Shabaz's friends, as well as who he eventually called when

they finally allowed him to do so - after cooperating. Wentz testified Mr. Shabaz contacted Khabir by telephone in the car ride to the FBI office after his interrogation, using his cell phone. (Tr 30). Hunt and Keenan contradicted Wentz, testifying that one call was made to Maritza from Keenan's phone after he dialed her number, on the ride downtown. (Tr 147, 165, 187, 217). Wentz testified he got Mr. Shabaz's girlfriend's number from Mr. Shabaz. Watson said Mr. Shabaz didn't know the number and needed it from his cell phone, which he did not have.  (Tr 133). Keenan didn't know how girlfriend's number was obtained. (Tr 165).

According to agents, Mr. Shabaz said he would speak with the officers and stop when he did not want to answer anymore questions. (Tr 81-82, 145). Mr. Shabaz gave details in response to law enforcements questioning during interrogation. (Tr 25, 90).

At some point during the interrogation, Mr. Shabaz was given a pre-printed consent to search form to sign. Initially, Wentz testified the handwritten portion was filled out by Agent Watson at 8:58 a.m., immediately after the advice of rights form was given to him at about 9:00 a.m.. No questioning had yet occurred. Later he said Mr. Shabaz's cell phone number was not filled out until they spoke to Mr. Shabaz. (Tr 63-65). Watson was not sure when it was given to Mr. Shabaz, but after questioning had begun. (Tr 128). Mr. Shabaz told him his cell phone number, which he wrote on the form. Keenan did not recall when the cell phone information was given to the FBI, nor the reason he did not sign it as a witness, though he claimed to be present. (Tr 166-69). Hunt claimed the interrogation had begun prior to Watson writing specifics on the consent to search form. (Tr 203-04).

Before Mr. Shabaz executed the consent to search form, law enforcement were inside his residence. They didn't apply for a search warrant until later, after agents received the executed consent to search form. (Tr 128).  Some of information obtained from Mr. Shabaz

during the interrogation was used to obtain the search warrant (Tr 129-31).

### III.    The Magistrate's Findings & Recommendations

In denying Mr. Shabaz's motion to suppress statements, the Magistrate concluded that by a preponderance of the evidence, Mr. Shabaz knowingly and voluntarily waived his *Miranda* rights. (Tr 352-53). The Magistrate found that although Mr. Shabaz refused to execute a written waiver of rights, which placed a heavy burden on the government to prove the waiver was voluntary, his refusal to sign the form did not render his statements involuntary.

The Magistrate found the circumstances of the arrest were not in material dispute. The circumstances of Mr. Shabaz's arrest at his residence did not overwhelm his will. (Tr 355-56).

The Magistrate found Watson's failure to inquire or investigate Mr. Shabaz's use of the word attorney or counselor troubling, noting "….[t]his is not conduct that is…appropriate for officers or agents to—to do when they have a person in custody and they make reference to an attorney…." Nonetheless, the court, accepting Mr. Shabaz's rendition of what occurred, found that Watson's decision to defer Shabaz's question: "am I going to be able to get an attorney," until they were in the interview room, did not constitute a denial of counsel, but simply a deferral. (Tr 358.)

The Magistrate discredited Mr. Shabaz's testimony that he wanted to call his girlfriend about getting an attorney for him because, according to the court, he testified to that fact on cross-examination and not on direct; (Tr 359) he produced no evidence that that the girlfriend received the request or that she contacted an attorney; and that according to Hunt, when Mr. Shabaz was allowed to finally call his girlfriend, he did not hear a request for counsel. (Tr 360).

The court also credited the government witnesses' explanation that a phone call was precluded because they were concerned about bomb-making materials at the Shabaz house, despite the fact that Watson admitted that their concerns about a bomb were unfounded. (Tr 361).

Concerning the events in the interview room surrounding the advice of rights form, the Magistrate found the circumstances of the interrogation room were not so onerous as to oppress and rob Mr. Shabaz of his free will. There was no physical force and the interrogation lasted only an hour. The court concluded that Mr. Shabaz would not have trusted the people who he expected to go to bat for him since they were violating his rights. Thus, his story was incredible. (Tr 366).

Finally, relying on the Seventh Circuit opinion in *Crisp*, which held that a defendant, in certain circumstances, may refuse to execute a waiver of rights form yet intend to voluntarily speak to law enforcement without an attorney, the Magistrate concluded that Mr. Shabaz was hedging his bets-talk to agents and see if it helps; if not, claim the statements were involuntarily. ( Tr 367-68).

The court endorsed Mr. Shabaz's testimony that he was given the consent to search form after the advice of rights form and after he had begun speaking to the agents about his case. (Tr 368). But, did not believe the handwritten portion of the form was blank.

Since the court held that Mr. Shabaz voluntarily decided to talk to agents, despite refusing to sign the advice of rights form, and his consent to search form was executed after that, nothing about the consent was tainted because there was no *Miranda* violation. (Tr 370).

IV.    **Argument**

A. The Magistrate Erred in Denying Mr. Shabaz's Motion to Suppress Statements

1.    *Law enforcement violated Mr. Shabaz's rights under Miranda &*
       *Edwards when questioning did not cease after his request for a*
       *lawyer*

According to Mr. Shabaz, his first request for an attorney after he was in custody, was in the Calumet City police station around the time he was using the bathroom. He asked Watson if he was going to be able to get an attorney. The request was clear and unequivocal. The Magistrate, in his ruling, found this to be a request, but characterized the officers' handling of the request as a deferral, not a denial.  The law makes no such distinction. Mr. Shabaz's right to an attorney was plainly invoked at that moment. When a defendant invokes his right to counsel, all interrogation must cease until counsel is made available. *Edwards v. Arizona*, 451 U.S. 477 ( 1981). *Edwards* is the second layer of prophylaxis for the *Miranda* right to counsel. Violation of the *Edwards* bright-line rule requires suppression of all statements given after initial assertion. *United States v. Briggs*, 273 F.3d 737 (7th Cir. 2001).

There is no dispute that after this request for counsel, Mr. Shabaz was subjected to questioning. He was escorted to the interrogation room where they informed him that, "We know what you've been doing. We know about your record. Why don't you start from the beginning… tell us what happened. We have DNA evidence, and … pictures." These remarks were improper, intended only to elicit incriminating statements from Mr. Shabaz. Plainly they were the functional equivalent to direct interrogation, a plea to Mr. Shabaz's conscience "to do the right thing," which is prohibited by *Miranda v. Arizona*, 384 U.S. 436 (1966) and its progeny. The Magistrate erred when he distinguished between a request and a request deferred. In this case, the so-called deferral resulted in a denial when Mr. Shabaz

arrived at the interrogation room and questioning followed in the absence of counsel.

Mr. Shabaz did not give up after his first request for counsel. For the next 15-20 minutes he went back and forth with law enforcement pleading for an attorney. He was denied counsel, confronted by only ongoing resistance to his requests and ultimately false promises of leniency. The government witnesses' claim that Mr. Shabaz did not make multiple requests for counsel is belied, not only by the multiple inconsistencies, contradictions, and sometimes incredible testimony adduced at hearing, but by an almost 20 minute period of time where they do not account for what transpired between them and Mr. Shabaz. For example, obviously wanting to maintain the position that Mr. Shabaz never asked for an attorney, Hunt asserted that Mr. Shabaz never mentioned the word attorney or lawyer and he was always in earshot of Shabaz and Watson during their trip to the bathroom, a position in sharp contrast to Watson's testimony that such words were used by Mr. Shabaz.

Moreover, the incredibility of Watson's account that he heard Mr. Shabaz use the word attorney but did not know in what context and clearly did not follow up on the matter, casts serious doubt on his rendition of events that followed. The incredulousness of this conduct did not go unnoticed by the Magistrate, but instead of dismissing it outright, he found that it was not  inappropriate conduct for officers or agents when they have a person in custody and they make reference to an attorney. The Magistrate actually credited Mr. Shabaz's version of the events, but legally concluded that there was not a denial of Mr. Shabaz's right to counsel, simply a deferral.

Law enforcement also violated Mr. Shabaz's *Miranda* rights when they spoke to him-questioned him about the crime without advising him of his rights. There is  no dispute that Mr. Shabaz arrived at the Calumet City police station about 8:30 a.m. He was not given his

*Miranda* warnings until 8:53 a.m. Watson admitted that prior to advising him of his rights, he told Mr. Shabaz that they knew he was involved and wanted to talk to him about the robberies. (Tr 53. 114). This conduct was interrogation or its functional equivalent and statements elicited in response must be suppressed in absence of the proper warnings.

2.     *Law enforcement violated Mr. Shabaz's rights by denying him a telephone call until after the interrogation*

It is undisputed that shortly after arriving in the interrogation room Mr. Shabaz requested phone calls, one to his girlfriend Maritza and another to a friend, Khabir. He was denied phone calls until after he spoke with law enforcement. (Tr 62,121). Watson's and Wentz's version of the denial of a phone call was based on law enforcement's concern about bomb making materials allegedly found at Mr. Shabaz's residence and the need to identify the persons Mr. Shabaz wanted to call. They claimed Mr. Shabaz did not know how to spell his girlfriend's name and did not know where she lived (Tr 10-11, 69, 121-22). Mr. Shabaz contends that the denial was plain and simple-he could call after he talked.

The agent's explanation of the events surrounding the request for phone calls is suspect. The contention that he did not know how to spell his girlfriend's name or did not know her address is pure nonsense and contradicted by Mr. Shabaz's testimony and the Magistrate's finding that Mr. Shabaz was intelligent and articulate. (Tr 366). Mr. Shabaz had been seeing this woman for over 3 years. He clearly knew her name and whereabouts. ( Tr 288-289).

The delay in allowing the phone calls was not related to bomb materials seen in plain view. Watson's account of the situation is problematic-one day in court he testified bomb sniffing dogs were called to the scene to detect suspicious materials-the next day he said no dogs were used, just the bomb squad. He didn't know what materials were seen or where they were seen and conceded no bomb materials were found at Mr. Shabaz's residence. (Tr

138-39, 293). Moreover, any phone call that Mr. Shabaz would have made while in custody would be monitored by the agents, thereby protecting the agents and public from any dangerous telephone communications.

The court did not credit Mr. Shabaz's account that he wanted Maritza to call an attorney mainly because it erroneously concluded that Mr. Shabaz did not reveal this fact until cross-examination. (Tr 332, 359). Apparently, the significance being that it was merely an afterthought conjured up on cross-examination. But the Magistrate was wrong. Mr. Shabaz stated on direct examination:

> …The purpose of calling my girlfriend was to not only inform her of my situation but to let her know that I'm going to need an attorney…She has a friend who is an attorney, and I was going to ask her to contact him. (Tr 247).

In *United States v. Millen*, 338 F. Supp. 747, 752 (D.C. Wis 1972), the court found that Millen's, an attorney, who was arrested and detained, request for a telephone call was an assertion of his rights and negated any inference of a waiver of his *Miranda* rights. Here, Mr. Shabaz asserted that same right. The court erred in finding it was not a *Miranda* violation.

3.    *Mr. Shabaz's refusal to sign the advice/waiver of rights form was an invocation of his rights to counsel and to remain silent*

It is uncontested that Mr. Shabaz refused to sign the advice/waiver of rights form and that Watson memorialized that refusal on the form. (See Govt Ex A). Mr. Shabaz  refused to execute the waiver because he wanted a lawyer. He was familiar with his right and had opted on a previous occasion to speak to arresting officers and waive his right to counsel. But in this instance, in this case, he was clear-he wanted an attorney and declined to sign a waiver. This was an invocation of his rights under *Miranda*.

The court emphasized Mr. Shabaz's intelligence when concluding that he voluntarily

waived his rights. But being properly warned and understanding your rights does not inevitably lead to the conclusion that statements were obtained without violating one's rights.

In U*nited States v. Hedgeman* 368 F. Supp 585 (N.D. Ill 1973) court found the defendant's refusal to sign a waiver of rights indicated that he did not wish to waive his rights. Nonetheless he spoke with agents. The court found the defendant's change of position was at best equivocal and the agents should have inquired further before continuing the questioning to determine whether his apparent change of position was the product of intelligence and understanding or of ignorance or confusion. *Id* at 589. Moreover, the agent's statements that the defendant could help himself by talking to them were calculated to mislead the defendant. "One who is beguiled can hardly be said to have intelligently waived his right to remain silent." *Id.*  See also *United States v. Nielson*, 392 F2d 849, 853 1968 (7th Cir. 1968)(a suspect who would not sign a waiver until he spoke with his attorney had invoked his right to remain silent); *Unites States v. Jenkins*, 440 F2d 574 (7th Cir 1971)(defendant refusal to sign a waiver of his rights indicated a desire to remain silent).

Mr. Shabaz, like the defendants in *Nielson*, *Jenkins*, and *Hedgeman,* refused to sign the waiver but agents persisted in their questioning. They never inquired further as to his change of position and essentially ignored his lack of written waiver. To make matters worse, the agents continually promised him leniency, beguiling him into talking to them despite his plea for counsel.

Of course, the government witnesses deny such requests for counsel occurred or that they endlessly promised him things would go easier if he cooperated. But their testimony was unreliable, laden with inconsistencies. The Magistrate commented on such consistencies- one in particular was the assorted versions of the timing of the tendering of the consent form to

Mr. Shabaz. It commented: "I agree with you that they're inconsistent on the timing of the consent to search form," (Tr  314). Standing alone these differences may not matter; but combined with the various versions, ambiguities and uncertainties among the government witnesses on almost every detail of December 21, 2007, except their denial that Mr. Shabaz requested counsel and that they made false promises of leniency, the government's "heavy burden" to demonstrate a knowing and intelligent waiver of Mr. Shabaz's right to an attorney was not satisfied.

The court  mistakenly relied on  *United States v. Crisp*, 435 F.2d 354 (7th Cir. 1970) in concluding that Mr. Shabaz voluntarily waived his right to a lawyer. In *Crisp*, the court upheld the admissibility of defendant's statements' to law enforcement despite his refusal to sign a waiver because the accused persisted in his expressed desire to make a statement notwithstanding his awareness of his rights and his attorney's absence. *Id.* at 358-59.  Unlike *Crisp*, in the case at bar, the record is devoid of any insistence on the part of Mr. Shabaz to make a statement. He was  persuaded that he would be rewarded by leniency if he talked. False promises of leniency were coercive and precipitated any waiver of *Miran*da rights. The Magistrate's ruling to the contrary, was erroneous.

>4.     *False promises of leniency rendered Mr. Shabaz's statements involuntary, violating his due process rights under the Fifth Amendment*

In the 20-minute period between Mr. Shabaz arriving in the interrogation room and his refusal to sign the waiver form law enforcement falsely promised him leniency. The promises were repeated until Mr. Shabaz believed his only choice was to speak, feeling frustrated and pushed into  a corner. He spoke only after he was convinced that their promises would be fulfilled, making his statements a product, not of rational intellect, but deceptive tactics. Mr. Shabaz was so gripped by the hope of leniency that he did not freely and rationally choose

among available courses of action. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973).

There is no reasonable explanation for a person with Mr. Shabaz's intelligence and experience to suddenly capitulate after multiple requests for counsel unless he was persuaded that he was facing a critical moment-talk now and catch a break or remain silent, get  a lawyer and get nothing but a lot of time. The inducement overcame Mr. Shabaz's will, resulting in an involuntary statement that ought to have been suppressed.

> B. The Government Failed to Meet its Burden that Mr. Shabaz's Statements were Voluntarily by not Producing all Materials Witnesses to his Statements

Five law enforcement officers were present during the interrogation of Mr. Shabaz. Only testified at hearing. Oak Lawn officer McGuire was not called as a witness. The government must produce all material witnesses to an alleged involuntary statement or explain their absence. It did not and thus did not discharge its burden of proving that Mr. Shabaz's statements were voluntary.

## V.        Adoption of all Arguments Presented at Hearing

Mr. Shabaz adopts and incorporates herein as part of these objections any and all arguments made at the hearing on his motion to suppress.

Wherefore, Mr. Shabaz prays this Honorable court sustain his objections and reject the Magistrates findings and recommendations.

Respectfully submitted,


S/Ellen R. Domph


Ellen R. Domph
53 West Jackson Blvd.,#  1544
Chicago, Illinois 60604
312-922-2525