```
          IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF ILLINOIS
                    EASTERN DIVISION


UNITED STATES OF AMERICA,     )
                              )
              Plaintiff,      )
                              )
     vs.                      )   No. 07 CR 855
                              )
SAMUEL SHABAZ,                )   Chicago, Illinois
                              )   April 11, 2008
              Defendant.      )   9:00 a.m.

              TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE SIDNEY I. SCHENKIER

APPEARANCES:

For the Government:       HON. PATRICK J. FITZGERALD
                          UNITED STATES ATTORNEY
                          BY:  MS. NATHALINA A. HUDSON
                               MS. MICHELLE NASSER WEISS
                          219 South Dearborn Street
                          Suite 500
                          Chicago, Illinois   60604
                          (312) 744-9653


For the Defendants:       LAW OFFICES OF ELLEN R. DOMPH
                          BY:  MS. ELLEN R. DOMPH
                          53 West Jackson Boulevard
                          Suite 1544
                          Chicago, Illinois   60604
                          (312) 922-2525

Court Reporter:


              CHARLES R. ZANDI, CSR, RPR, FCRR
                    Official Court Reporter
                    219 S. Dearborn Street
                         Suite 1728
                   Chicago, Illinois   60604
                       (312) 435-5387
          email: charles_zandi@ilnd.uscourts.gov
```

1        (Proceedings heard in open court.)
2            THE CLERK:  07 CR 855, United States of America
3   versus Samuel Shabaz.
4            MS. HUDSON:  Nathalina Hudson and Michelle Weiss on
5   behalf of the United States.
6            THE COURT:  Good morning.
7            MS. WEISS:  Good morning, your Honor.
8            MS. DOMPH:  Ellen Domph on behalf of Mr. Shabaz.
9            THE COURT:  Good morning.  Did the rightful owner of
10  those notes --
11           MS. DOMPH:  They were mine.
12           THE COURT:  -- left at the podium pick them up?
13           MS. DOMPH:  Yes.  Were they here?
14           THE COURT:  They were underneath the podium.  That's
15  how you forgot them.
16           MS. DOMPH:  Thanks.
17           THE COURT:  I'm prepared to rule on the motion.  I'm
18  not going to issue a written opinion.  I'm going to make
19  findings on the record.  My findings will stand as my findings
20  and the recommendation that I make on the motion to suppress.
21  So, it will probably take a few minutes.  If people want to sit
22  down, that's fine.
23           I am -- let me begin by thanking the lawyers for the
24  presentations that they made.  I think you made very fine
25  presentations.  I especially appreciate the authority that

1 Ms. Domph supplied after the hearing, which I thought was a
2 very fair selection of cases that address this issue from
3 different perspectives, and I think that was very helpful to
4 the Court as I then heard your arguments.
5       I am going to recommend to Judge Conlon that the
6 motion to suppress be denied.  What I'm going to do now is set
7 forth the various findings and the case law that leads me to
8 that recommendation.
9       And let me start with an overview of what I consider
10 to be the important case law on this point.  Of course, what we
11 were dealing with as the threshold here was whether there was a
12 knowing and intelligent waiver of Miranda rights by Mr. Shabaz.
13 Plainly, Miranda rights, just about like any rights that we
14 have, can be waived; but in order for that waiver to be
15 effective, it must be a knowing and a voluntary waiver.  <u>United
16 States versus Jackson</u>, 300 F.3d, 740 at 748, a Seventh Circuit
17 decision from 2002.
18       That waiver must be the product of rational intellect
19 and free will.  <u>United States versus Brooks</u>, 125 F.3d, 484,
20 Seventh Circuit decision, 1997.
21       And in deciding whether the waiver meets that
22 standard, we look at the totality of the circumstances, which
23 includes consideration of the defendant's background and
24 conduct, the duration and conditions of detention, the mental
25 and physical condition of the defendant, the attitude of the

1  police, and whether the police utilized psychological or
2  physical coercion. Jackson, 300 F.3d at 748.
3         The burden of proof is on the government to show that
4  the waiver was knowing and voluntary, with the burden being by
5  a preponderance of the evidence. Lego versus Twomey,
6  T-W-O-M-E-Y, 404 United States 477 at 489, a 1972 decision.
7         Now, of course, one way of showing that there was a
8  knowing and intelligent waiver is to have a document such as
9  was an exhibit in this case, an advice of rights, Government
10 Exhibit 1, that is tendered to the defendant and that is signed
11 by the defendant. The case law indicates that this kind of
12 written waiver is not required in order for there to be an
13 effective waiver. Jackson holds that at 300 F.3d at 748, as
14 does United States versus Crisp, 435 F.2d 354-358, a Seventh
15 Circuit decision from 1970.
16        But we don't have, in this case, as I've indicated,
17 and the evidence clearly shows, a signed waiver of rights. But
18 what we have is a situation where the waiver of rights form,
19 the advice of rights with the waiver on it, was tendered to the
20 defendant, and the defendant refused to sign it. I don't think
21 that there's any dispute in the evidence that there was a
22 refusal to sign it.
23        And in that scenario, Seventh Circuit case law
24 indicates that the government has a -- the case law says heavy
25 burden or especially heavy burden variously, to show that the

1 waiver is voluntary.  United States versus Jenkins, 440 F.2d,
2 574-576, the Seventh Circuit decision from 1971 calls the
3 burden a heavy one.  United States versus Millen, 338 Federal
4 Supplement 747 at 752, an Eastern District of Wisconsin
5 decision from 1972, calls it an especially heavy burden.
6 United States versus Hedgemen, H-E-D-G-E-M-E-N, 353 Federal
7 Supplement 585 at 598, a Northern District supplement from
8 1983, speaks of the already heavy burden being greater.
9         Now, none of those cases in any way quantify what the
10 difference is between that heavy burden and preponderance of
11 the evidence, but I think that tells counsel at a minimum that
12 when you have a written waiver that is tendered to the
13 defendant and the defendant refuses to sign it, a very close
14 look at the evidence is warranted to determine whether, in
15 fact, any subsequent statements were voluntary.
16         Now, the Seventh Circuit case law indicates that
17 there are circumstances where that -- where the refusal to sign
18 the waiver will not render subsequent statements involuntary.
19 Crisp is one scenario where in that case, the defendant,
20 despite making -- despite being given an advice of rights form
21 and being asked to sign a written waiver, refused to sign it,
22 made an obvious -- expressed an obvious desire to talk to the
23 agents despite not signing it and without there being
24 intervening colloquy or discussion between the agents or
25 officers and the defendant.

Case 1:07-cr-00855   Document 58-3   Filed 04/23/2008   Page 6 of 10

354

1  On the other hand, we have a situation such as in
2 Jenkins, where the subsequent statement was suppressed, where
3 there was a refusal to sign the waiver of Miranda rights, but
4 there was then further discussion or interrogation that ensued
5 before any statements were made, discussions that were
6 initiated not by the defendant but by the officers or agents.
7 And Hedgemen presents a similar situation.
8  And in Hedgemen, the Court suggested that when
9 someone refused to sign a right -- I'm sorry, a waiver of
10 rights, then there is some intervening delay or some
11 inconsistency as a result of further discussion, and then they
12 decide to talk to agents, that there should be further inquiry
13 to make sure that there is an intent to waive.
14  Now, it's in consideration of that case law that I
15 have assessed the evidence and that I make the findings and the
16 recommendations that I do. And I want to start with a brief
17 discussion of the circumstances of the arrest, which are not, I
18 think, in material dispute.
19  Approximately 8:00 a.m. or so on December 21st,
20 2007, a number of agents and officers from the Oak Lawn Police
21 Department, the FBI, and Chicago Police Department assembled
22 outside of the defendant's home. They entered the home after
23 knocking and having no response. They entered by breaking down
24 the door. They entered with guns drawn.
25  The defendant was found in bed, clothed in sweat

1  pants and shirt, which would be consistent with being a
2  sleeping outfit or having been up and gone back to bed, but
3  certainly early in the morning, about 8:00 o'clock or so.  He
4  was handcuffed.  He was then taken in a police car to the
5  Calumet police station.
6         At that time, at the time of the arrest, there is no
7  dispute that Mr. Shabaz was not given any Miranda warnings, but
8  there also is no dispute that he made no statements and was not
9  questioned about the offense at that time.
10         In looking at the circumstances of the arrest, I
11 don't find that they were such that they overwhelmed
12 Mr. Shabaz's will and rendered any later statements to be
13 involuntary.  At least from what I have observed, it is not
14 uncommon for officers who enter a house to make an arrest to
15 have a show of force to deter people who may be inside from
16 resisting in some violent manner.
17         Mr. Shabaz had been arrested before, so this was not
18 a new event.  Whether it was a new event to be done in this
19 way, there's no evidence, so I can't speak to that.  But I will
20 note that the evidence from Mr. Shabaz's testimony was that he
21 was sufficiently composed at the time that when he left the
22 house, he asked for certain things, and he was able to observe
23 what time it was when he left the house.
24         I don't see anything in the circumstances of the
25 arrest that leads me to conclude that Mr. Shabaz, by that

1 event, had his will overwhelmed, and I note that during the
2 defense's very fine closing argument, this was not cited as a
3 factor that led to any later statement being involuntary. But
4 because there was significant testimony about it, I do address
5 it.
6            Mr. Shabaz was then taken in a police car to the
7 Calumet police station. He was removed from the car by several
8 agents. They were walked -- they walked up the corridor to a
9 room, at which time, before they entered the interview room,
10 Mr. Shabaz asked to be able to use the bathroom, and he was
11 allowed to do so.
12           Before the officers and agents who accompanied
13 Mr. Shabaz took him in to the police station, the undisputed
14 testimony is that they left their guns locked in the trunk of
15 one of the cars so that they were not armed when they
16 accompanied Mr. Shabaz in to the police station. Mr. Shabaz,
17 of course, was handcuffed.
18           Now, there is testimony about the use of the word
19 "attorney" or "counselor" at the time that Mr. Shabaz went to
20 the rest room. The testimony from Agent Watson was that he
21 heard the word "attorney" or "counselor," but he did not know
22 the context in which it was used. He did not interpret it as a
23 request for an attorney, but he also testified that he didn't
24 know what it referred to. He made no inquiry into what it
25 referred to.

1    Mr. Shabaz's testimony is different than that. He
2 says that he asked, "Am I going to be able to get an attorney,"
3 and Mr. -- and Agent Watson's response was, "Let's get into the
4 interview room."
5    Now, under Agent Watson's rendition of this, I'm
6 troubled by the proposition that when a defendant in custody,
7 which Mr. Shabaz plainly was, pursuant to an arrest warrant
8 that had been issued, when an agent has a person in custody and
9 the person makes reference to an attorney or counsel, that
10 there is apparently a lack of curiosity or interest in knowing
11 what the defendant is referring to and finding out whether that
12 is a request for counsel.
13    Agent Watson did testify later that he was very
14 concerned about making sure that people had their rights, and I
15 think that it would be consistent with that if he heard the
16 word "counsel" or "attorney" to find out what that was
17 referring to instead of, according to Agent Watson, simply,
18 really ignoring it because he didn't understand it, and because
19 he didn't understand it, he didn't interpret it as a request
20 for counsel. That is not conduct that is, in my judgment,
21 appropriate for officers or agents to -- to do when they have a
22 person in custody and they make reference to an attorney or
23 counsel.
24    Now, that said, under Mr. Shabaz's rendition of what
25 occurred, there was not at that time a refusal to provide an

1  attorney. There wasn't a denial. "Am I going to be able to
2  get an attorney?" He says, according to Mr. Shabaz, Agent
3  Watson did not say, "No, you are not." What he did was he
4  deferred the question, based on Mr. Shabaz's testimony, to the
5  time when they entered the interview, which was immediately
6  after going to the bathroom.
7         So, while I -- even accepting Agent Watson's
8  testimony, I would be very critical of his conduct, even
9  accepting Mr. Shabaz's testimony, I don't find that there was a
10 denial of counsel at that point; but it is simply, in my
11 judgment, under his rendition, a deferral until they entered
12 the interview room, which was immediately thereafter.
13        Now, in the interview room, we have a great deal of
14 dispute about what occurred or what didn't occur. And I want
15 to break it into two categories. I guess two categories will
16 suffice. One is what happened in the interview room prior to
17 Mr. Shabaz being provided with the advice of rights form that
18 is Government Exhibit 1 and being asked to sign a waiver, and
19 then the second is what happened when that was presented and
20 the immediate aftermath of that.
21        Now, according to the -- you know, I'm sorry. Before
22 I get to that, there's one other matter I want to address
23 before that, and that is a request for a phone call. There is
24 testimony that either right before or right when he got in to
25 the interview room, Mr. Shabaz asked to call his girlfriend