1  Maritza, call another friend, Khabir.  Mr. Shabaz says that he
2  indicated he wanted to contact his girlfriend in part in order
3  to have her contact an attorney.
4          Now, with respect to the request to contact Khabir, I
5  think the undisputed testimony was that Mr. Shabaz didn't have
6  Khabir's phone number, and that where that phone number was
7  located was in Mr. Shabaz's telephone, and that telephone was
8  in his home and not at the station.  I'm going to circle back
9  to that later.
10         With respect to the request to call Maritza, I don't
11 find it credible that he was asking to contact Maritza in order
12 for her to contact an attorney or to provide other assistance.
13         Now, I note that when Mr. Shabaz did contact Maritza
14 in a telephone call after the events at the Calumet police
15 station were concluded and he was being transported to FBI
16 facilities, he testified that he did ask Maritza to get an
17 attorney.  Now, Officer Hunt from the Oak Lawn Police
18 Department, who was in the back seat with Mr. Shabaz, said that
19 he heard Mr. Shabaz's end of the conversation, and that
20 Mr. Shabaz did not make that request to Maritza.
21         I find that credible for several reasons.  One is
22 that when Mr. Shabaz said that he asked for an attorney, at
23 least my notes reflect, he did not do that on the direct
24 examination by his attorney but injected that for the first
25 time on cross-examination.

1        Beyond that, I don't have any corroborating evidence,
2   which would strike me would be available if it existed, that
3   Maritza, in fact, received that request.  I don't have any
4   evidence that there was an attorney contacted by Maritza in
5   response to any inquiry made by Mr. Shabaz, as he alleges.  I
6   also don't have any evidence that some attorney who was
7   allegedly contacted by Maritza ever reached out and tried to
8   contact Mr. Shabaz.  So, I don't have any corroboration of
9   that, and in all the circumstances, I credit Officer Hunt's
10  testimony over that of Mr. Shabaz on this point.
11       There was also testimony concerning some reason by
12  the defendant -- I'm sorry, by the government to delay any
13  phone call because of concern over potential bomb-making
14  material that had been found in Mr. Shabaz's home that,
15  according to the government, was in plain view.  Now, there was
16  some discrepancy in the government testimony.  Particularly,
17  Mr. -- Agent Watson testified that there were bomb dogs brought
18  to the house, or a bomb dog -- I should say a bomb-sniffing dog
19  brought to the house to determine whether that was the case.
20  That was later corrected, that it was some other bomb
21  personnel.
22       But under either version, the fact that there is
23  undisputed testimony that there were personnel sent to the
24  house because of some concern over there being bomb-making
25  material there does provide some corroboration for why the

government may have been concerned about simply allowing a phone call to someone that the government had not yet determined anything about.

I think that it was reasonable for them to be cautious in those circumstances before allowing Mr. Shabaz to call a person and potentially communicate some kind of signal to someone who might be involved with him in that activity. And while the defense pointed out that the call could be monitored, which is certainly true, monitoring a call may or may not be effective if you don't know what kind of code or signals people may be speaking in if they're doing it.

Now, as it turned out -- as it turned out later, upon further inquiry, there wasn't bomb-making material or there were no bombs that were made or found, so it turned out to be a false alarm; but that's something that was determined after the fact, and so when looking at it from the vantage point of the officers and agents at the time, before it was determined to be a false alarm, I think that their activity -- their caution in allowing the phone call was appropriate.

Now, let me turn to the interview room and what allegedly occurred prior to the tender of the advice of rights and then subsequent to it. The government witnesses all testified that prior to the tender of the advice of rights form, there was very little that was said. Both Special Agent Wentz and Agent Watson testified, you know, in a generally

1 consistent way on this point.
2        Special Agent Wentz said it was basically, "We know
3 it's you." Agent Watson testified that he explained why the
4 defendant was under arrest. And they then said that he was
5 thereafter immediately given the advice of rights form.
6        Defendant has a very different recollection of what
7 occurred. Mr. Shabaz testified that there was extended
8 questioning that preceded any tender of the advice of rights
9 form, most of it by Agent Watson, although some of it by
10 Officer Keenan.
11        Mr. Shabaz said that he consistently, during this
12 period, asked for an attorney, asked for phone calls.
13 Mr. Shabaz said that Agent Watson said, "We know what you did.
14 We have evidence. Tell us what happened." He said there was a
15 refusal to take off the handcuffs, even though Mr. Shabaz
16 requested it.
17        And on that point, I do find it credible that
18 Mr. Shabaz was handcuffed in some fashion during this
19 interview. I don't find any government testimony that
20 contradicts that. Most of the government witnesses testified
21 to a lack of recollection about whether he was handcuffed,
22 which I find rather remarkable, given that they were in the
23 room with him for, by everybody's account, about an hour, and
24 that during this period of time, Mr. Shabaz signed one form,
25 Government Exhibit 2, the consent to search, and also made

1  notations on some photographs. I think that was Government
2  Exhibit 4. And it would seem to me it would be pretty obvious
3  whether somebody is handcuffed when they were affixing their
4  signature or other writings to various materials. So, I find
5  that Mr. Shabaz was, in fact, handcuffed during the interview.
6       Mr. Shabaz said that Agent Watson asked several times
7  about what happened in April, referring to the date of alleged
8  criminal activity, and that Mr. Shabaz needed to talk before
9  getting a phone call. Mr. Shabaz said that Agent Watson told
10 him, "It will go easier if you talk now," and that Officer
11 Keenan then spoke and said prosecutors look favorably on
12 cooperation and so things would go easier if, in fact,
13 Mr. Shabaz cooperated. Mr. Shabaz said that only after all
14 of this colloquy, which took, according to Mr. Shabaz, about
15 10 minutes, did he receive the waiver of rights form.
16      Now, the government says that when the form was
17 presented, Mr. Shabaz read it aloud, but refused to sign it,
18 but at the same time he refused to sign it also said that he
19 would talk to the agents and officers, and that he would stop
20 if and when he decided to do so, and that he then began to talk
21 to them without any promises being made and without asking for
22 an attorney.
23      Mr. Shabaz again has a different rendition of the
24 events. He said he was, in fact, given the waiver form, and
25 that he did read the waiver form, although he -- and I keep

1 saying waiver form. It's titled advice of rights, and when I'm
2 referring to that, it's Government Exhibit 1, so that we have
3 clarity on the record.
4     Mr. Shabaz said that he read it to himself, not
5 aloud. Mr. Shabaz testified that he had a good understanding
6 of what his rights were, of what the advice of rights form
7 meant. Mr. Shabaz testified he had been presented with such a
8 form in connection with an earlier criminal matter with which
9 he had been charged.
10     Mr. Shabaz said he told the officers and agents that
11 he would not sign the form and that this prompted further
12 statements and questions by Agent Watson and by Officer Keenan.
13 Mr. Shabaz said that Officer Keenan said cooperation would go a
14 long way and he should talk now. Agent Watson, according to
15 Mr. Shabaz, said that he was looking at a lot of time, and it
16 would be better if he cooperated now.
17     Mr. Shabaz said he asked to call Maritza, his
18 girlfriend, and Agent Watson, in response, said, "This is a
19 critical moment," and that cooperation would make things go
20 easier.
21     Mr. Shabaz said that Agent Watson tried to question
22 him then about names and dates and bomb-making materials, and
23 that when Mr. Shabaz asked for a phone call, Mr. Shabaz was
24 told to be patient.
25     Mr. Shabaz then said he finally started to talk to

1 the agents and to answer the substantive questions that he said
2 were asked after about 20 minutes of this conduct.  Mr. Shabaz
3 said he did so because he was frustrated and that he thought
4 that if he played ball with the agents and officers, that they
5 would go to bat for him.
6          Now, in considering the competing testimony on these
7 matters, I find the government evidence to be more credible
8 than that of Mr. Shabaz for several reasons.  First, the
9 circumstances in the interrogation room were not so onerous as
10 to, by virtue of those circumstances, oppress Mr. Shabaz and
11 rob him of the ability to exercise free will.  Mr. Shabaz was
12 handcuffed, but he did not testify to any physical discomfort,
13 and there's no dispute that there was no physical coercion
14 involved in terms of his interrogation.  There was no threat of
15 physical force that was used.
16          Mr. Shabaz had been allowed to use the rest room
17 before entering the interview room.  Mr. Shabaz testified that
18 he had water while he was in the interview room.  Mr. Shabaz
19 testified that he had no food while he was in the interview
20 room, but he also did not testify that he asked for any food
21 from the officers.
22          And the time in the interview room was, by all
23 accounts, relatively short, something in the range of an hour
24 or so, plus or minus, depending on people's recollection of
25 time.  But we're talking about the same general range of time,

not an interview period that lasted for hours and hours and hours.

There's also no indication, of course, that Mr. Shabaz was sleep deprived, because he had just been arrested after having slept and was arrested out of his bed, so -- and I don't find, then, the circumstances of the interrogation in that respect to be such as to have overridden free will.

Second, I don't find it credible that Mr. Shabaz, if he experienced the conduct by the officers and agents that he described, would have talked to them because, as he said, he trusted them to go to bat for him if he did so.  To accept that would be to accept the proposition that Mr. Shabaz chose to trust people who he said disregarded and violated the rights that he knew he had.  I've heard no good explanation about, based on Mr. Shabaz's view, why he would trust the people who he says were violating his rights, why he viewed them as people who he could trust to go to bat for him, after, according to his testimony, 15 or 20 minutes in the interrogation room.

Third, and related to that point, Mr. Shabaz testified that he clearly understood his rights, and Mr. Shabaz is plainly an intelligent and well-spoken person.  The evidence is that he is not a high school graduate, but he did get his high school equivalency, a GED.  During his testimony, he displayed an excellent command of language.  He displayed

1 excellent ability to understand the questions that were put to
2 him and to answer them in a very clear manner.  He plainly is
3 familiar with the advice of rights form, as he testified.
4          So, we have here a defendant who is not a naive
5 person who was unschooled in his rights.  We have here a
6 defendant who is not a teenager or some young, unsophisticated
7 person who had never been in this situation before.  Mr. Shabaz
8 testified that he had been in the situation of being
9 interrogated, had been presented with an advice of rights form.
10 He understood he had a right not to talk if he chose and that
11 he had a right to talk if he chose to do that.
12          Fourth, as the Seventh Circuit decision in <u>Crisp</u>
13 confirms, there are situations in which a defendant might
14 refuse to sign an advice of rights form waiving his rights of
15 silence and the right to have an attorney and yet intend to
16 talk to agents or officers without an attorney and to do that
17 knowingly and voluntarily.
18          One might ask, I suppose:  Why would somebody do
19 that?  Apart from the answer that human motivation is always an
20 interesting thing to discern, I can envision a situation where
21 a defendant who is experienced in the criminal law and the
22 system and has been through prior criminal offenses might do
23 that to hedge his bets, to talk to the agents and officers and
24 see if the cooperation helps, but at the same time, refuse to
25 sign the form so if unsatisfied with the result, he can claim

1  that he did not talk voluntarily.  And in reviewing all of the
2  circumstances in the evidence, I find that that likely is what
3  occurred here.
4         Now, with respect to the consent to search form,
5  there are discrepancies in the evidence about certain aspects
6  of the tendering of the form and the signing of the form.  The
7  government witnesses disagree about precisely when the form was
8  provided to Mr. Shabaz; but at least some of them agree with
9  Mr. Shabaz that it was certainly more than a few minutes after
10 Mr. Shabaz was presented with the advice of rights form and
11 after he had started talking to the agents, and so I find that
12 to be credible, that he did not sign and was not presented with
13 the consent to search form until after he had been presented
14 with the advice of rights form and after he had already started
15 to talk to the agents about the case.
16        Now, there is also a dispute about whether the
17 handwritten portion of the consent to search form, portions 1-A
18 through D in Government Exhibit 2, had been placed on the form
19 prior to it being handed to Mr. Shabaz, as the government
20 witnesses say, or whether Mr. Shabaz was presented with the
21 form in blank, without that handwritten material being filled
22 in, and that Mr. Shabaz signed the form without having the
23 material filled in, as he says.
24        I find the government testimony on that point about
25 whether it was filled out before Mr. Shabaz signed it to be