UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.    07 CR 855 |
| v. | ) | |
| | ) | Judge Suzanne B. Conlon |
| SAMUEL SHABAZ | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

The United States of America, by its attorney, PATRICK J. FITZGERALD, United States

Attorney for the Northern District of Illinois, respectfully submits this response to defendant's

objection to the Magistrate Judge's Report and Recommendation.

*FACTUAL BACKGROUND*

On December 21, 2007, the defendant was arrested at his home by FBI agents.  Tr. at 7,

74.  After his arrest, defendant was transported by FBI and Oak Lawn Police Department

("OLPD") (collectively "law enforcement") to the Calumet City Police Department. Tr. 8.

Defendant was placed in an interview room along with four law enforcement officers: FBI

Agents Brian Watson and Brian Wentz, and OLPD Detectives Dennis Keenan and James Hunt.

A fifth law enforcement officer, OLPD Detective Christine McGuire, was also present during

portions of the interview.  Tr. 9.

FBI agents advised defendant of his rights per *Miranda*.  Tr. 14.  After being advised of

his rights, the defendant told the officers that he understood his rights, but he refused to sign the

"Advice of Rights" form. Tr. 15  The defendant told the officers that he would listen to them and

answer questions without an attorney, and that he would stop the interview when he wanted to

1

stop talking. Tr. 81  During this meeting, defendant requested the opportunity to speak with two individuals: his girlfriend, Maritza Velazques, and a friend with the first name Kabir whom defendant was scheduled to pick up from the airport. Tr. 247, 271.  Defendant did not have the telephone number for Kabir, but he told law enforcement that they could retrieve his telephone number from defendant's cellular telephone at his residence.[1] Tr. 29.  According to all four law enforcement officers who were present for the entirety of the interview, defendant at no time – either before or after being advised of his *Miranda* rights – requested an attorney. Tr. 25,12.,79,144,146,177,182.  The only time the defendant made reference to an attorney was prior to entering the interview room at Calumet City. Tr. 276.  The defendant asked Agent Watson, "am I going to be able to get an attorney." Tr. 276.  At no time during the interview, did anyone make any promises of leniency to the defendant.  Tr. 86, 12.

After being presented with the advice of rights form, FBI agents presented defendant with an FBI FD-26 "Consent to Search" form,  which was completed in his presence with descriptions of defendant's house, two Dodge vans, and cellular telephone.  Tr. 17-18. The defendant gave the agents his cell phone number to be included on the consent to search form so that the agents could get Kabir's phone number for the defendant.  Tr. 19.   Defendant read the form, stated he understood, and signed the form in the presence of law enforcement.  Tr. 20.

---

[1]Agents conducted a brief background check of Maritza Velazques and Kabir LNU before allowing defendant to contact them, to prevent the possibility that defendant intended to contact them in furtherance of criminal activity. Tr. 29-30, Tr. 134. Defendant was later allowed to contact Maritza, in fact, used an officer's cellular telephone to do so while in route after the interview. Tr. 187. After hanging up the telephone, defendant told an officer that his girlfriend just broke up with him. Tr. 187.

Once the questioning began, the defendant confessed in detail to robbing the TCF bank at 9801 S. Cicero Avenue, Oak Lawn, Illinois, on April 26, 2007, and October 1, 2007, and attempting to rob the Standard Bank and Trust at 4700 111th Street, Oak Lawn, Illinois, on September 21, 2007. Tr. 89-90. Defendant provided detailed information regarding his planning and execution of the bank robberies, his motive, and what he did with the money he obtained in the bank robberies. Tr. 90. During the interview, law enforcement showed defendant bank surveillance photographs from each of the three bank robberies, and he signed them. Tr. 91.

### *ARGUMENT*

As a preliminary matter, this Court reviews *de novo* those portions of the Magistrate Judge's recommendations to which objections have been filed. *See Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995). However, the court is not required to conduct another hearing to review the magistrate judge's findings or credibility determinations. *See id.* Additionally, the court does not have to exercise its *de novo* discretion in reviewing the credibility determination made by the Magistrate Judge. *See United States v. O'Neill*, 27 F.Supp.2d 1121, 1143 (7th Cir. 1998). Indeed, the court may give the Magistrate's credibility determinations such weight as their merit demands. *See id.*

Defendant moved to suppress his post-arrest statements. The Magistrate held an evidentiary hearing, and concluded that the government's evidence was more credible than the defendant's testimony. Tr. 371. As a result, the Magistrate Judge issued a report and recommendation denying the defendant's Motion to Suppress. The defendant filed objections to the Magistrate's Report and Recommendation on the following grounds: (1) law enforcement violated the defendant's rights under *Miranda* and *Edwards* when questioning did not cease after

his request for an attorney; (2) law enforcement violated Mr. Shabaz's rights by denying him a telephone call until after the interrogation; (3) Mr. Shabaz's refusal to sign the advice/waiver of rights form was an invocation of his rights to counsel and to remain silent; (4) false promises of leniency rendered Mr. Shabaz's statements involuntary, violating his due process rights under the Fifth Amendment; and (5) the government failed to meet its burden that Mr. Shabaz's statements were voluntary by not producing all material witnesses to his statements. The defendant's arguments are without merit.

**A.**    **The Magistrate Judge correctly found by a preponderance of the evidence that the defendant did not make an unequivocal request for counsel.**

Defendant argues that the Magistrate Judge erred in denying his motion to suppress the post-arrest statements. Defendant's Obj. 9. Specifically, defendant argues that he made his first request for an attorney while he was in the bathroom at the Calumet City police station. Defendant's Obj. 9. According to defendant, prior to entering the interview room, he asked Agent Watson, "am I going to be able to get an attorney?" Tr. 276-77. Defendant testified that Agent Watson responded, "let's just get you in here, something to that effect, motioning towards the room at the end of the corridor." Tr. 276-77. During the hearing, Agent Watson testified that he remembered the defendant used the word attorney or lawyer prior to being mirandized. Tr. 79-80. However, Agent Watson testified that the defendant did not say anything or ask to have a lawyer present at any time during the post-Miranda interview. Tr. 79.

Contrary to the defendant's assertion, the Magistrate Judge did not rule that the defendant's statement, "am I going to get an attorney"was an unequivocal request for an attorney. Based upon the defendant's version of events, the Magistrate Judge stated that Agent Watson

deferred the defendant's question, "am I going to be able to get an attorney?," to the time when they entered the interview room. Tr. 358.

It is well settled that the *Miranda* right to counsel attaches only when a suspect invokes the right during custodial interrogation by making a clear and unequivocal request for counsel. *Davis v. U.S.*, 512 U.S. 452, 458-59 (1994). In *Davis*, the defendant waived his right to counsel and then during questioning said, "Maybe I should talk to a lawyer." *Id.* at 455. The Court held that the defendant's request was ambiguous and reasoned that a suspect's request for counsel must be clear enough to alert a reasonable police officer under the circumstances that the suspect is requesting an attorney. *Id.* at 459; *see e.g.*, *U.S. v. Bezanson-Perkins*, 390 F.3d 34, 36, 40 (1st Cir. 2004)(no clear invocation of right when defendant said, "So if I requested a lawyer, there would be one that would come right now?"); *Diaz v. Senkowski*, 76 F.3d 61, 63 (2d Cir.1996) (no clear invocation of right to counsel when defendant inquired, "Do you think I need a lawyer?"); *U.S. v. Walker*, 272 F.3d 407, 413-412 (7th Cir. 2001) (no clear invocation of right to counsel when defendant said he wasn't sure whether he should talk to agent because he was afraid it would anger his lawyer).

Accordingly, the Magistrate Judge properly characterized the defendant's statement "Am I going to be able to get an attorney?," as a question that was posed by the defendant and deferred by Agent Watson, and not an unequivocal request that was denied. Therefore, under *Miranda*, the defendant's rights were not violated.

5

**B.    The Magistrate Judge did not err when he found by a preponderance of the evidence that the defendant's request to make a phone call did not constitute an invocation of his rights to an attorney.**

Following the Magistrate Judge's finding that, prior to entering the interview room, defendant did not invoke his right to counsel, but simply posed a question to Agent Watson, the Magistrate Judge addressed the defendant's assertions that he asked to make a phone call to secure counsel. Agent Watson testified that the defendant's request to make a phone call was initially denied because the agents had received information that there was bomb making material in plain view, and the agents thought there could be a terrorist connection. Tr. 136. The defendant testified that, upon entering the interview room, he asked to call Maritza. Tr. 247. However, the defendant testified that at no time did he inform law enforcement that the purpose of contacting Maritza was so she could contact an attorney on his behalf. Tr. 271.

The defendant also testified that he was able to talk to Maritza after the interview concluded. Tr. 266. During direct examination, when he was asked what he said to her concerning a lawyer, the defendant responded, "Well, we had a few words previous, I mean, beforehand. She understood my situation because I explained it to her. She's basically crying on the phone. She said something to the effect that, you know, I feel so bad I wish I could help. I wish there is something I could do." Tr. 267.   On cross examination, when the defendant was asked whether or not he asked Maritza to call an attorney for him, the defendant said that once she started crying she felt bad, and asked him if there was something she could do. The defendant stated that he responded, "yes, there is something you can do. Get me an attorney." Tr. 285.   The Magistrate Judge held that the defendant's testimony was not credible with respect to his request to contact Maritza. Tr. 359. In making his ruling, the Magistrate Judge explained:

Now, I note that when Mr. Shabaz did contact Maritza in a telephone call after the events at the Calumet police station were concluded, and he was being transported to FBI facilities, he testified that he did ask Maritza to get an attorney. Now, Officer Hunt from the Oak Lawn Police Department, who was in the back seat with Mr. Shabaz, said that he heard Mr. Shabaz's end of the conversation, and that Mr. Shabaz did not make that request to Maritza. I find that credible for several reasons. One is that when Mr. Shabaz said that he asked for an attorney, at least my notes reflect, he did not do that on direct examination by his attorney, but injected that for the first time on cross examination. Beyond that, I don't have any corroborating evidence which would strike me would be available if it existed, that Maritza, in fact, received that request. I don't have any evidence that there was an attorney contacted by Maritza in response to any inquiry made by Mr. Shabaz, as he alleges. I also don't have any evidence that some attorney who was allegedly contacted by Maritza ever reached out and tried to contact Mr. Shabaz. So, I don't have any corroboration of that, and in all the circumstances, I credit officer Hunt's testimony over that of Mr. Shabaz on this point.

Tr. 359-60. Accordingly, based on the evidence presented at the hearing, the Magistrate Judge correctly held that the defendant's request to call Maritza was not a request to secure counsel.

With respect to the defendant's assertion that he wanted to call Kabir to request an attorney, the defendant's own testimony belies the defendant's argument. The defendant testified that he wanted to call Kabir. Tr. 271. On re-direct, the defendant testified that one of the reasons he wanted to contact Kabir was so that he could tell him he would not be able to pick him up from the airport. Tr. 289. The defendant also testified that while he wanted to call Kabir, he did not have Kabir's phone number with him at the station and he did not know Kabir's number. Tr. 271. However, the defendant testified that he knew where his phone number was located, but he didn't give anyone any information as to how to obtain Kabir's phone number. Tr. 272-273. The defendant never testified that he wanted to contact Kabir so that he could call an attorney on his behalf. Tr. 289, 247. The defendant stated that he did not tell law enforcement officials that he wanted to contact Kabir so that he could call an attorney for him. Tr. 271-72.

7

The Magistrate Judge found that the undisputed testimony was that the defendant did not have Kabir's phone number, and that the phone number was in the defendant's telephone back at the house. Tr. 359.The defendant, however, testified that he did not give the officer's his cell phone number so that he could get Kabir's phone number. Tr. 272. The Magistrate Judge found the defendant's testimony to be unpersuasive with respect to Kabir. Tr. 369. Accordingly, the evidence presented at the suppression hearing was sufficient to find by a preponderance of the evidence that defendant never voiced or articulated to law enforcement that he wanted to contact Maritza or Kabir so that they could contact an attorney on his behalf.

Despite the Magistrate Judge's credibility determination that the defendant did not seek to secure counsel by requesting to call Maritza or Kabir, the defendant asserts that, under *United States v. Millen*, the mere fact that the defendant requested a phone call is an invocation of his right to counsel. In *Millen*, the defendant, a tax attorney, was arrested without a warrant for possession of marijuana. *See id.* at 749. The police officer who arrested the defendant verbally advised the defendant of his rights on the street. *See id.* The defendant was then taken to the Marshall's office. *See id.* While at the Marshall's office, the defendant requested to make a phone call. *See id.* The defendant's request for a phone call was denied. *See id.* Subsequent to being refused a phone call, the defendant was asked by a federal agent whether or not he had been advised of his rights. *See id.* The defendant said that he had been advised of his rights by a local officer. *See id.* The federal agent did not ask the defendant whether he wished to waive those rights. *See id.* at 750. The federal agent did not allow the defendant to make a phone call, and he proceeded to interview the defendant. *See id.* During the interview, the defendant provided the agents with information regarding the location of the marijuana. *See id.* The

8

defendant sought to suppress all of his statements. *See id.* The court held that since the defendant, unfamiliar with criminal law and in a state of emotional and psychological shock, was never asked if he wished to waive his rights, but asked to make a phone call, the defendant's request was an assertion of his rights. *See id.* at 751-52.

This case is distinguishable from *Millen*. Unlike the defendant in *Millen*, the defendant is very familiar with the criminal justice system and aware of his rights. Tr. 285-86. Additionally, unlike the defendant in *Millen*, the defendant in this case was advised of his rights, and asked if he wanted to waive those rights. Tr. 15. Furthermore, unlike the court in *Millen*, the Magistrate Judge credited the agents' testimony, and found that the defendant waived his *Miranda* rights and agreed to talk to law enforcement without an attorney present. Tr. 369 Finally, unlike the court in *Millen*, the Magistrate Judge determined that the evidence supported a finding that the defendant's request for a phone call was not an assertion of his rights. Tr. 359, 369. Accordingly, *Millen* is not applicable to this case.

**C.      The Magistrate Judge did not err when he found by a preponderance of the evidence that the defendant's refusal to sign the advice of rights form did not constitute an invocation of his right to counsel.**

The defendant contends that the Magistrate Judge erred in denying his motion to suppress because the defendant refused to sign the advice/waiver of rights form, which was an invocation of his rights to counsel and to remain silent. The defendant's argument is without merit. In support of his argument, the defendant urges this court to rely upon the holdings in *United States v. Nielsen*, 392 F.2d 849 (7th Cir. 1968), *United States v. Hedgeman*, 368 F. Supp. 585 (N.D. Ill. 1973), and *United States v. Jenkins*, 440 F.2d 574 (7th Cir. 1971). However, those cases are distinguishable from this case.

In *Nielsen*, the defendant was advised of his rights twice, and provided an advice of rights form. 392 F.2d at 851. The defendant stated that he was not going to sign anything until he spoke to his attorney. *See id.* The agent offered the defendant the opportunity to contact an attorney, but the defendant stated that he would call his attorney in the morning. *See id.* The defendant stated that the agent could proceed with the questioning. *See id.* Following the defendant's statement, the agent asked the defendant questions about his involvement with J.P. Suit and a stolen vehicle. *See id.* The defendant gave negative answers. *See id.* The court held that since the defendant refused to sign the form, but decided to talk, the agents should have inquired as to whether or not the defendant fully understood his change of position. *See id.* at 853. Accordingly, the court held that since the agent failed to inquire into the defendant's change of mind, the defendant did not respond to questions after making a knowing and intelligent waiver of rights. *See id.*

In *Hedgeman*, the defendant was arrested at home. 368 F. Supp. at 586. The defendant told the agents that he wanted to call his attorney. *See id.* at 586. The agents granted the defendant permission to call his attorney. *See id.* The defendant's attorney was unavailable, but an associate from his attorney's office called him back. *See id.* The associate instructed the defendant not to make any statements to the FBI. *See id.* While the defendant was being transported from his home to the FBI office, the defendant was advised of his rights. *See id.* The agents also provided the defendant with the FBI waiver of rights form, which the defendant refused to sign. *See id.* Once the defendant was at the FBI office, the defendant was advised of his rights. *See id.* He was told that "if you should decide to say anything now without your attorney present that you could stop answering at any time." *Id.* at 587. The defendant stated

that he understood. *See id.* Following the defendant's statement, the defendant started to answer questions without an attorney present. *See id.* The court held that because the defendant was represented and refused to signed the waiver form, the agents should have inquired further as to whether or not the defendant's waiver was voluntary. *See id.* As a result, the defendant's statements were suppressed. *See id.* at 590-591.

In *Jenkins*, the defendant was interviewed two days after he had been arrested for passing counterfeit bills. 440 F.2d at 574. During the interview, the defendant was orally advised of his rights and tendered a waiver of rights form by a federal agent. *See id.* The defendant refused to sign the form. *See id.* However, the agent proceeded to question the defendant, and the defendant provided responses to the agent's questions. *See id.* The court held that since the agent did not inquire into whether or not the defendant fully understood that he was waiving his rights by answering the agent's questions, the defendant's statements should have been suppressed. *See id.* at 577.

The defendant's reliance on *Nielsen*, *Jenkins* and *Hedgeman* is misplaced. Unlike the defendants in *Nielsen* and *Hedgeman*, the Magistrate Judge found that the government's evidence was more credible that the defendant said that he would talk, and the defendant did not make an unequivocal request for an attorney. Tr. 358, 371. Additionally, unlike the defendants in *Nielsen*, *Hedgeman* and *Jenkins*, the Magistrate Judge found that the defendant refused to sign the waiver, but he made a knowing and voluntary waiver by agreeing to talk to the agents and stop answering questions on his own. Tr. 363. Accordingly, principles set forth in *Nielsen*, *Jenkins* and *Hedgeman* are inapplicable.

11

During the suppression hearing, the Magistrate Judge found that the government's evidence was more credible as to the issue of whether the defendant voluntarily waived his rights after refusing to sign the advice of rights form for the following four reasons:

First, the circumstances in the interrogation room were not so onerous as to, by virtue of those circumstances, oppress Mr. Shabaz and rob him of the ability to exercise free will. Mr. Shabaz was handcuffed, but he did not testify to any physical discomfort, and there's no dispute that there was no physical coercion involved in terms of his interrogation. There was no threat of physical force that was used. Mr. Shabaz had been allowed to use the rest room before entering the interview room. Mr. Shabaz testified that he had water while he was in the interview room. Mr. Shabaz testified that he had no food while he was in the interview room, but he also did not testify that he asked for any food from the officers. And the time in the interview room was, by all accounts, relatively short, something in the range of an hour or so, plus or minus, depending on people's recollection of time. But we're talking about the same general range of time, not an interview period that lasted for hours and hours and hours. There's also no indication, of course, that Mr. Shabaz was sleep deprived because he had just been arrested after having slept and was arrested out of his bed, so I don't find, then, the circumstances of the interrogation n that respect to be such as to have overridden free will.

Second, I don't find it credible that Mr. Shabaz, if he experienced the conduct by the officers and agents that he described, would have talked to them because, as he said, he trusted them to go to bat for him if he did so. To accept that would be to accept the proposition that Mr. Shabaz chose to trust people who he said disregarded and violated the rights that he knew he had. I've heard not good explanation about, based on Mr. Shabaz's view, why he would trust the people he says were violating his rights, why he viewed them as people who he could trust to go to bat for him, after, according to his testimony, 15 or 20 minutes in the interrogation room.

Third, and related to that point, Mr. Shabaz testified that he clearly understood his rights, and Mr. Shabaz is plainly an intelligent and well-spoken person. The evidence is that he is not a high school graduate, but he did get his high school equivalency, a GED. During his testimony, he displayed an excellent command of language. He displayed excellent ability to understand the questions that were put to him and to answer them in a very clear manner. He plainly is familiar with the advice of rights form as he testified. So, we have here a defendant who is not a naive person who was unschooled in his rights. We have here a defendant who is not a teenager or some young, unsophisticated person who had never been in this

12

situation before.  Mr. Shabaz testified that he had been in the situation of being
interrogated, had been presented with and advice of rights form.  He understood
he had a right not to talk if he chose and that he had a right to talk if he chose to
do that.

Fourth, as the Seventh Circuit decision in *Crisp* confirms, there are situations in
which a defendant might refuse to sign an advice of rights form waiving his rights
of silence and the right to have and attorney and yet intend to talk to agents or
officers without an attorney and to do that knowingly and voluntarily.   One might
ask, I suppose: why would somebody do that? Apart from the answer that human
motivation is always an interesting thing to discern, I can envision a situation
where a defendant who is experienced in the criminal law and the system and has
been through prior criminal offenses might do that to hedge his bets, to talk to the
agents and officers and see if the cooperation helps, but at the same time, refuse to
sign the forms so if unsatisfied with the result, he can claim that he did not talk
voluntarily.  And in reviewing all of the circumstances in the evidence, I find that
that likely is what occurred here.

Tr. 365-368.  Accordingly, the Magistrate Judge appropriately considered the totality of the

circumstances, and correctly found that the defendant's statements were voluntary and the

defendant's *Miranda* rights were not violated.

Furthermore, the Magistrate Judge correctly found that this case is more akin to *United

States v. Crisp*, 435 F.2d 354 (7th Cir. 1971).  In *Crisp,* the defendant was interviewed by federal

agents regarding a bank robbery.  *See id* at 357.   The agents read the defendant his rights, but the

defendant  declined to sign the form.  *See id.*  The defendant told them that he understood his

rights, was represented by counsel, and nevertheless wanted to talk to them. *See id.*  The court

held that since the defendant persisted in his express desire to pass information to the Assistant

United States Attorney even after being informed of his rights and absent his attorney, the

defendant waived his rights despite his refusal to sign the form.  *See id.* at 358.

The evidence during the suppression hearing supports a finding that this case is  similar to

*Crisp*.  Like the defendant in *Crisp*, the defendant in this case refused to sign the advice of rights

form. Tr. 15.   Further, like the defendant in Crisp, the defendant is familiar with the criminal

justice system and understood his rights. Tr. 367.   Additionally, the Magistrate Judge concluded

that the defendant made  a knowing and voluntary waiver because the only plausible explanation

as to why the defendant refused to sign the form, but decided to talk was so that he could hedge

his bets  to talk to the agents and officers and see if the cooperation helps, but at the same time,

refuse to sign the forms so if unsatisfied with the result, he can claim that he did not talk

voluntarily.   Tr. 367-68.  Accordingly, since the Magistrate Judge found that the defendant

voluntarily agreed to talk to the agents in order to further his own self interests, the defendant's

failure to sign the advice of rights form was not fatal.  Therefore, as in *Crisp*, the Magistrate

Judge properly found that the defendant voluntarily waived his rights.

**D.**     **The Magistrate Judge did not err when he found by a preponderance of the**
           **evidence that no promises were made to the defendant, and the defendant**
           **voluntarily waived his *Miranda* Rights.**

          The defendant also contends that the agents' false promises of leniency rendered Mr.

Shabaz's statements involuntary, violating his due process rights under the Fifth Amendment.

The defendant's argument is without merit.  Law enforcement agents testified that at no time

during the interview were any promises made to the defendant. Tr. 363,21,82,146,187.  The

defendant, however, testified that at least two agents told him that "it will go easier if you talk

now." Tr. 363.  The defendant stated that he talked to the agents after his refusal to sign the form

because they made promises to him and believed they would go to bat for him.  Tr. 365. The

Magistrate Judge evaluated the competing testimony with respect to this issue, and he concluded

that the government's evidence was more credible.  The Magistrate Judge found that there was

14

no reason the defendant should have trusted the law enforcement officers to go to bat for him if they had allegedly violated his rights. Tr. 365-368. Based on the Magistrate's ruling, no promises were made to the defendant and the defendant's will was not overborne. Accordingly, the defendant knowingly and voluntarily waived his rights.

**E.    The Magistrate Judge did not err when he relied on the witnesses presented by the government, and found by a preponderance of the evidence that the defendant's statements were voluntary and his rights under *Miranda* were not violated.**

Finally, the defendant argues that the government failed to meet its burden that Mr. Shabaz's statements were voluntary by not producing all material witnesses to the defendant's statements. The defendant's argument is without merit. It is well settled that a judge may draw an adverse inference from one party's failure to produce a knowledgeable witness only if the evidence shows that the witness was either physically or pragmatically available to only one party. *See United States v. Pizarro*, 717 F.2d 336, 346 (7th Cir. 1983). All four law enforcement officers who testified during the hearing were present during the entire interview with the defendant. Tr. 9. It is undisputed that Detective McGuire, an Oak Lawn police officer, was present during portions of the defendant's interview. Tr. 9. However, the government interviewed Detective McGuire and determined that her testimony would be cumulative and did not call Detective McGuire. Nevertheless, the government provided the defendant with the interview of Detective McGuire. *See* Exhibit A. Here, under *Pizarro*, the defendant should be barred from asserting that the government did not prove its case because it did not call Detective McGuire because the defendant was aware of Detective McGuire's statements, but failed to subpoena the defendant or request that the defendant be produced at the hearing.

15

WHEREFORE, the government moves this Court to deny the defendant's Objection to the Report and Recommendation.

Respectfully submitted,

PATRICK J. FITZGERALD

United States Attorney

/s/ Nathalina A. Hudson
NATHALINA A. HUDSON
MICHELLE NASSER WEISS
Assistant United States Attorneys
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-1123
(312) 469-6201



U.S. Department of Justice

*United States Attorney*
*Northern District of Illinois*

| | | |
|---|---|---|
| *Nathalina A. Hudson*<br>*Assistant U.S. Attorney* | *Everett McKinley Dirksen Building*<br>*219 South Dearborn Street -5th Floor*<br>*Chicago, Illinois  60604* | *(312) 353–1123 (ph.)*<br>*(312)353-4324 (fax)* |

March 6, 2008

**<u>Via U.S. Hand-delivery</u>**
Ellen R. Domph
Law Offices of Ellen R. Domph
53 W. Jackson Blvd.
Chicago, IL 60604

      **Re:**   *United States v. Shabaz,*
               Case No. 07 CR 855

Dear Ms. Domph:

      Pursuant to Local Rule 16.1 (formerly Local Rule 2.04) and Rule 16 of the Federal Rules of Criminal Procedure, I disclose the following additional documents Bates stamped U.S. v. Shabaz 353- 429.

                     With regards,

                     PATRICK J. FITZGERALD
                     United States Attorney

      By:
                     NATHALINA A. HUDSON
                     Assistant United States Attorney
                     219 S. Dearborn Street
                     Chicago, IL 60604
                     (312) 353-1123



GOVERNMENT
EXHIBIT

A

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription   02/25/2008

On February 25, 2008, detective CHRISTINE MCGUIRE, Oak Lawn Police Department, Oak Lawn, Illinois, was interviewed at the Federal Bureau of Investigation(FBI), Chicago Division, South Resident Agency(SRA, in Orland Park, Illinois.  After being advised of the identity of the interviewing agent and the nature of the interview MCGUIRE provided the following information:

MCGUIRE advised that she was present at the arrest of SAMUEL SHABAZ.  SHABAZ was arrested by FBI Special Agents(SAs) and Police Officers from Oak Lawn Police Department on December 21, 2007, for Bank Robbery.  MCGUIRE was not in the vehicle in which SHABAZ was transported from his house to the Calumet City Police Department.

MCGUIRE was present during the interview of SHABAZ at the Calumet City Police Department.  MCGUIRE advised that FBI SA's conducted the interview and she was "in and out" of the room during the interview.  She left the room on one occasion to get a cup of water for SHABAZ.

While MCGUIRE was in the interview room, she heard SA BRYAN WATSON read SHABAZ his Miranda rights.  MCGUIRE also advised that SHABAZ was very cooperative  and that he was providing SA's with information regarding the various bank robbery's that he had committed.  He was very descriptive about each bank robbery and even discussed his surveillance of each bank prior to robbing them.

During his interview, SHABAZ asked if he could make a telephone call to his girlfriend.  SA's and Detectives assured him that he would be allowed to call his girlfriend after they were able to locate his cellular phone and after they were to identify his girlfriend.

While she was present at the interview of SHABAZ, he(SHABAZ) never made any statements about requesting to see or speak with an attorney.

MCGUIRE was not in the vehicle in which SHABAZ was transported from Calumet City Police Department to the FBI, Chicago Division office building.  MCGUIRE was present during SHABAZ's processing at the FBI office.  He did not make any statements, in

---

Investigation on   2/25/2008   at  Orland Park, Illinois

File #  91A-CG-127940                              Date dictated  Not dictated

by   SA Christopher M. Soyez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

U.S. v. SHABAZ   000000425

FD-302a (Rev. 10-6-95)

Continuation of FD-302 of ___CHRISTINE MCGUIRE_____ , On _2/25/2008___ , Page ___2___

    her presence, regarding speaking with an attorney.  MCGUIRE was
    told that SHABAZ was allowed to make a telephone call to his
    girlfriend during his transport to the FBI office.

U.S. v. SHABAZ  000000426

FD-302 (Rev. 10-6-95)

- 1 -

## FEDERAL BUREAU OF INVESTIGATION

Date of transcription     02/25/2008

    On February 21, 2008, Detective DENNIS KEENAN and
Detective JAMES HUNT, Oak Lawn Police Department, were interviewed
separately by Assistant United State's Attorney(AUSA) Nathalina
Hudson and AUSA Michelle Weis at the United State's Federal
Building, 219 South Dearborn, Chicago, Illinois.

    Detective KEENAN was interviewed first.  Present during
the interview were AUSA Hudson, AUSA Weis, and Federal Bureau of
Investigation(FBI) Special Agent(SA) Christopher M. Soyez.  After
being advised of the identity of the interviewing agent and the
nature of the interview, detective KEENAN provided the following
information:

    Det. KEENAN was present at the arrest of SAMUEL SHABAZ.
SHABAZ was arrested by FBI Special Agents(SAs) and Police Officers
from Oak Lawn Police Department on December 21, 2007, for Bank
Robbery.  Det. KEENAN did not speak with SHABAZ or hear him make
any statements at the time of his arrest.

    Det. KEENAN was present at the Calumet City Police
Department for the post-arrest interview of SHABAZ.  SHABAZ was not
handcuffed at the time of his interview.  Before any questioning
began, SHABAZ was read his Miranda rights by FBI SA Byran Watson.
SHABAZ refused to sign the Advice of Rights form.  SA Watson
acknowledged, in writing, that SHABAZ refused to sign.  While
SHABAZ refused to sign the Advice of Rights form, he never
requested to meet with an attorney.

    SHABAZ asked SA's and detectives if he could make a
telephone call to his girlfriend.  SHABAZ was told that he would be
able to make a telephone at a later time.  SHABAZ was never told
that the phone call was a benefit for cooperating with law
enforcement(SA's and detectives).

    SHABAZ spoke with law enforcement about various bank
robberies that he had committed.  SHABAZ viewed photographs of
different bank robberies and initialed the photographs which
depicted him(SHABAZ) committing the bank robberies.

    Det. KEENAN was present in the car for the transport of
SHABAZ from the Calumet City Police Department to the FBI Office

---

Investigation on  2/21/2008     at  Chicago, Illinois

File #  91A-CG-127940                         Date dictated  Not dictated

by   SA Christopher M. Soyez

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency;
it and its contents are not to be distributed outside your agency.

U.S. v. SHABAZ   000000427

D-302a (Rev. 10-6-95)

91A-CG-127940

Continuation of FD-302 of ___DET. DENNIS KEENAN: DET. JAMES HUNT , On 2/21/2008 ___ , Page ___2___

Building for post arrest processing. Also present was SA Wentz and
Det. Hunt. SHABAZ was allowed to use the cellular phone to speak
with his girlfriend. The conversation between SHABAZ and his
girlfriend lasted approximately ten(10) minutes. At no time during
his transport or during his processing, did SHABAZ request to speak
with an attorney.


        Following Det. KEENAN's interview, Det. HUNT was
interviewed. Present during the interview were AUSA Hudson, AUSA
Weis, and Federal Bureau of Investigation(FBI) Special Agent(SA)
Christopher M. Soyez. After being advised of the identity of the
interviewing agent and the nature of the interview, detective HUNT
provided the following information:

        Det. HUNT was present at the arrest of SHABAZ. He did
not hear SHABAZ make any statements at the time of his(SHABAZ)
arrest.

        Det. HUNT rode in a car with SA Brian Wentz for the
transport of SHABAZ to the Calumet City Police Department. SHABAZ
did not make any statements during the transport. SA Wentz advised
SHABAZ that he(SHABAZ) was going to the Calumet City Police
Department and that law enforcement(SA's and Detectives) would
speak with him(SHABAZ) there.

        At the Police Department, SHABAZ was interviewed in a
conference room. Present for the interview were SA Watson, SA
Wentz, Det. KEENAN, Det. Hunt, and Det. CHRISTINE MCGUIRE.

        SHABAZ was read his Advice of Rights. SHABAZ did not
sign the form. SA's and Det.'s signed the form acknowledging that
SHABAZ refused to sign the form.

        SHABAZ then recalled events from different bank robberies
that he(SHABAZ) had committed.

        SHABAZ never requested to see or speak with an attorney.
SHABAZ only asked if he could make a phone call to his girlfriend.
He also requested to make a telephone call to a guy which
he(SHABAZ) had to pick up from the airport.

        Det. HUNT was present in the car for the transport of
SHABAZ from the Calumet City Police Department to the FBI Office

U.S. v. SHABAZ   000000428

D-302a (Rev. 10-6-95)

91A-CG-127940

Continuation of FD-302 of ___DET. DENNIS KEENAN; DET. JAMES HUNT___, On _2/21/2008_____, Page ___3___

    Building for processing.  Also present were SA Wentz and Det.
KEENAN.  During the transport, SHABAZ was allowed to make a
cellular phone call to his girlfriend.  After the conversation
between SHABAZ and his girlfriend, SHABAZ told Det. HUNT that
"she(SHABAZ's girlfriend) just broke up with me".
SHABAZ also made a statement to his girlfriend that, "I'm(SHABAZ)
in trouble".

       SHABAZ did not make any statements during transport or
processing that he wanted to speak with an attorney.